**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
**BRIAN KLAUBER,**                      )
                                        )
                **Plaintiff,**          )          **Civil Action No.**
                                        )          **19-12498-FDS**
        **v.**                          )
                                        )
**VMWARE, INC,**                        )
                                        )
                **Defendant.**          )
_____)


**MEMORANDUM AND ORDER ON DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE</u>**

**SAYLOR, C.J.**

This is a case concerning the payment of an employee's commission-based

compensation.  Plaintiff Brian Klauber worked for defendant VMware, Inc. in a variety of roles

from 2012 until his resignation in 2019.  Throughout his employment, VMware paid Klauber

both a base salary and commission-based compensation.

VMware provides its sales-related employees with individual commission plans that are

specific to each employee's role and responsibilities and the products for which they are

responsible.  Those individual plans set out commission rates and compensation targets.

VMware also provides employees with more generally applicable terms and conditions that

define when commissions are "earned."  For example, there are certain types of transactions as to

which VMware has reserved the right to modify commissions, which it refers to as "Exception

Transactions" or "Exceptional Transactions."[1]  Those types of transactions generally involve deals that are extraordinarily large in nature or that involve a high degree of participation by upper management.

The central dispute in this case is whether Klauber is owed certain commission-based compensation.  He contends that he was not paid the full commission rates that he earned on two different deals.  VMware contends that these two deals were "Exception[al] Transactions," and because Klauber signed off on both his personal plans and the general terms and conditions, it was acting within its rights under the contracts to modify his commissions related to those specific transactions.  Klauber, however, contends that the terms of the plans are unenforceable because they violate the Massachusetts Wage Act.

The complaint asserts four claims:  nonpayment of wages (Count 1); breach of contract (Count 2); unjust enrichment (Count 3); and quantum meruit (Count 4).

Defendant has moved for summary judgment as to all counts.  Defendant has also filed a motion to strike.  For the reasons set forth below, defendant's motion to strike will be granted in part and denied in part and defendant's motion for summary judgment will be granted.

## I.   <u>Background</u>

The following facts are presented in the light most favorable to the non-moving party and are undisputed unless otherwise noted.

### A.   <u>Factual Background</u>

#### 1.   <u>Klauber's Employment History</u>

VMware, Inc. is a computer software company that specializes in cloud networking and

---

[1] For clarity and consistency, this Court will refer to these types of transactions as "Exceptional Transactions."

security.  (Núñez Aff. ¶ 4).

In July 2012, Brian Klauber began employment with VMware as a result of the acquisition of DynamicOps, Inc. (his former employer) by VMware.  (Dkt. No. 76, Ex. 1 ("Klauber Dep.") 21-22; Compl. ¶ 4).  Until approximately April 2018, he worked as a solutions consultant (later retitled to solutions engineer).  (Klauber Dep. 31).  As a solutions consultant, Klauber focused on the technical aspects of sales.  (*Id.* at 31-32).  He was primarily responsible for being a subject-matter expert on the products.  (*Id.* at 32).  In May 2018, Klauber became a landed global account executive at VMware.  (*Id.* at 30-31).

Ravi Kagalavadi, the Director of Global Accounts Sales Engineering, supervised Klauber in his role as a solutions consultant until approximately April 2018.  (*Id.*; Howe Aff. Ex. 2 ("Kagalavadi Dep.") 12-13).  Richard "Rocky" Soper, the Vice President of Strategy, Planning for Global Accounts, supervised Klauber from approximately May 2018 to mid-2019 in his role as a landed global account executive.  (*Id.*; Howe Aff. Ex. 3 ("Soper Dep.") 18).

During his employment with VMware, VMware paid Klauber both a base salary and commission-based compensation.  (Klauber Dep. 35-36).  There is no dispute that VMware paid his base salary in full.  (*Id.* at 35-36).

## 2.      Klauber's Acceptance of VMware's Commission Plans

VMware issues different commission plans to its commission-eligible employees. (Núñez Aff. ¶ 5; Page Aff. ¶ 7).  Specifically, each employee eligible for commission compensation is issued a personal plan that is customized to their specific role and responsibility. (*Id.*).  The personal plans include specific commission rates, compensation targets, and quotas for the specific products that fall within the scope of that employee's territory.  (*Id.*; Klauber Dep. 54-56).  VMware periodically modifies individual employees' plans; when that occurs,

VMware will reissue a plan (referred to as a "redeployment").  (Núñez Aff. ¶ 7; Klauber Dep. 39-40).  That can occur, for example, due to changes in the products an employee is responsible for selling.  (*Id.*).  If an employee's plan is "redeployed," they are provided with a copy of the new plan, which they have to sign to accept.  (Núñez Aff. ¶ 7; *see* Klauber Dep. 45-46, 53).

VMware also issues overarching terms and conditions that govern each employee's plan and apply to commission-eligible employees across the company.  (Núñez Aff. ¶¶ 6, 8; Page Aff. ¶¶ 6,8; Klauber Dep. 54-56, 81).  A "redeployment" does not change the underlying terms and conditions that govern each employee's plan.  (Núñez Aff. ¶ 7).

Periodically during Klauber's employment, VMware emailed him his personal plan and a link to the general terms and conditions.  (Klauber Dep. 36-38).  Klauber would scroll through the terms and conditions and then e-sign to confirm acceptance of both his plan and the general terms and conditions.  (*Id.* at 38-39; 45-46).  For fiscal years 2017 through 2020, by e-signature, Klauber accepted the terms and conditions of each of his plans.  (*Id.* at 53).  It appears that he reviewed the terms and conditions at least once and possibly more, although he does not recall when he did so.  (Klauber Dep. 78-79).  Klauber cannot recall an instance where he objected to or challenged the terms and conditions before accepting his plans.  (*Id.* at 55-56, 59, 71).[2]

### 3.    Relevant Provisions of VMware Plan Terms and Conditions

VMware's general terms and conditions define when commissions are earned.  (Núñez Aff. ¶ 9; Page Aff. ¶ 9).  Generally, commissions are earned after all of the following have occurred:  (1) the participant accepted his or her plan; (2) the participant has eligible quota achievement; and (3) a plan "reconciliation" has been completed by VMware.  (Núñez Aff. ¶ 9;

---

[2] Klauber does not dispute that he never objected to the terms and conditions before accepting his plans but contends that he did dispute and complain about commission amounts VMware provided him on several occasions. (Plaintiff Statement of Material Facts ("SOF") ¶ 17).

Page Aff. ¶ 9; Plaintiff Mem. Ex. 2 ("18H2 Terms & Conditions"), Section 5.1; Plaintiff Mem.

Ex. 4 ("19H2 Terms & Conditions"), Section 6.1).  For example, the terms and conditions for

fiscal year 2018 provide as follows:

> Commissions are "Earned" by Participants only after all of the
> following have occurred:
>
> a)   The Participant Accepted his or her Compensation Plan.
>
> b)   The Participant has eligible Quota Achievement.
>
> c)   A Plan Reconciliation, including but not limited to the review
>      of any transactions deemed to be Exception[al] Transactions,
>      splits, and other Adjustments, has been completed by VMware,
>      analyzing all commissionable events, draws, Commissions
>      paid, and factors affecting Variable Compensation.  Plan
>      Reconciliation occurs after the end of the Plan Period.  As a
>      result, to the extent VMware makes any payments for Variable
>      Compensation before this Plan Reconciliation has been
>      completed, such payments are preliminary advances for
>      Variable Compensation that has not yet been earned and are
>      subject to Adjustment until Plan Reconciliation.

(18H2 Terms & Conditions, Section 5.1).  In substance, the terms and conditions for fiscal year

2019 are essentially the same as the terms and conditions for 2018.  (*See* 19H2 Terms &

Conditions, Section 6.1).

The 2018 terms and conditions define "Exception[al] Transactions" as follows:

> In addition to the Company's right to modify plans pursuant to
> Section 2.9, there are some exceptional transactions that may not
> be treated in accordance with the normal Plan terms and rules
> ("Exception[al] Transactions"), and the Company reserves the
> right and sole discretion to make commission adjustments for such
> transactions.  Exception[al] Transactions include but are not
> limited to the examples below:
>
> • The Top 10 customer deals within a quarter;
> • Any transaction value which exceeds more than 100% of
>   the Participant's assigned Quota and/or was not carried in
>   the Participant's assigned Quota;
> • Net Order Value in excess of $2,000,000 USD (originating
>   from any of the strategically-aligned companies under

> Dell);
> - Any transaction which involves atypical management involvement, including a transaction that arises through limited Participant involvement or effort;
> - Any transaction which was unanticipated, either in that it was not forecasted or the transaction value exceeds forecast estimates; and/or
> - Any transaction that contains non-standard terms or is atypical or extraordinary for some other reason.
>
> The head of Worldwide Sales may authorize Adjustments (commission rate, Commission amount or crediting changes) with respect to any Exception[al] Transaction.  Exception[al] Transactions will be reviewed on a case by case basis, based on the individual circumstances of the particular Exception[al] Transaction, and any resolution or adjustment will be made at the sole discretion of the head of Worldwide Sales.  Participants will receive notice of any crediting and commission Adjustments due to Exception[al] Transactions, which will not require redeployment of a Compensation Plan.

(18H2 Terms & Conditions, Section 2.10).  Again, in substance, the definition of "Exception[al] Transactions" in the 2019 terms and conditions is essentially the same as in the 2018 terms and conditions.  (*See* 19H2 Terms & Conditions, Section 11.1).

The sales, sales operations, or finance leadership are responsible for identifying Exceptional Transactions that should be reviewed.  (*Id.*).  An analysis is then conducted as to the financial and compensation impact of those transactions.  (*Id.*).  If, after reviewing the transaction, the business recommendation is to approve an adjustment, the recommendation is presented to the Sales Compensation Committee for consideration and approval.  (*Id.*).  The Sales Compensation Committee may authorize adjustments with respect to any Exceptional Transaction.  (*Id.*).  Exceptional Transactions are reviewed on a case by case basis, based on the individual circumstances of the particular transaction, and any resolution or adjustment is made at the sole discretion of the head of the Sales Compensation Committee.  (*Id.*).

The 2019 terms and conditions also contain a "Large Deal Review Policy" that states the

following:

> Typically, VMware does not assign quota based on forecasted
> Large Deals; therefore, VMware reviews the commission treatment
> for all Large Deals prior to commission payment.
>
> A Large Deal is defined as any deal with an order value greater
> than or equal to $10M USD.

(*Id.* at Section 11.2).  The Sales Compensation Committee may also authorize adjustments with

respect to any large deal.  Final payout on large deals is at the sole discretion of and must be

authorized by the Sales Compensation Committee.  (*Id.*).

Klauber was familiar with the "Large Deal Review Policy" in the 2019 terms and

conditions and recalls hearing about the policy's ten-million-dollar threshold during a

conversation with one of his peers.  (Klauber Dep. 159).

During Klauber's employment with VMware, the company used a software tool called

Varicent to track commissions.  (Núñez Aff. ¶ 14; SOF ¶ 32).

### 4. <u>The DXC Deal</u>

DXC Technology Corporation is a technology services company.  (Page Aff. ¶ 11).  In

fiscal year 2018, VMware closed a deal with DXC.  (*Id.*)  The deal was valued at more than $130

million, which was very large from the perspective of VMware.  (*Id.*).  The deal was also

atypical in several ways.  It involved significant involvement of the most senior VMware

executives, including Michael Dell, the CEO and majority owner of Dell, Inc. (VMware's

majority owner).  (*Id.*).  In addition, it involved an atypical use of "tokens," or credits, that DXC

bought and could be consumed or "burned down" over time (similar in concept to buying a gift

card with a set amount of money that could be used for various purchases over time).  (*Id.*).

Rather than DXC consuming the tokens themselves, as is typically the case, VMware agreed that

DXC could resell the tokens to third parties.  (*Id.*).

Klauber worked on the DXC deal.  (Klauber Dep. 106-08).  He was responsible for educating customers and answering pre-sales questions related to certain VMware products in the vRealize management product line.  (*Id.* at 109).

Before Klauber's commission on the DXC deal was determined, the deal went through the reconciliation process outlined in VMware's terms and conditions and was reviewed by the head of worldwide sales and other senior leadership at VMware.  (Page Aff. ¶ 12).  Those senior leaders determined that the deal would be treated as an Exceptional Transaction due to several factors, including the size of the deal, the high level of involvement of senior management, and the atypical nature of the terms (including the third-party token arrangement).  (*Id.* ¶ 13).  Because of VMware's decision to treat the DXC deal as an Exceptional Transaction, certain employee commissions were adjusted.  (*Id.* ¶ 15).  As a result, Klauber did not earn any commissions from the DXC transaction.  (*Id.*).

Ravi Kagalavadi, Klauber's supervisor at the time, informed Klauber that VMware would not pay him a commission arising out of the DXC deal.  (Klauber Dep. 114-16, 119).

A dispute-resolution mechanism is outlined in the terms and conditions.  It provides that participants should first raise a dispute with their immediate manager, who will then review the request with sales operations.  Within 10 days of receiving a response from their manager or sales operations, participants can take the dispute to the Sales Compensation Review Board.  (*See* 18H2 Terms & Conditions, Section 2.7).  Klauber took the first step, by discussing his objection with Kagalavadi, but did not pursue the matter further.  (Klauber Dep. 126-28).

### 5. <u>The Barclays Deal</u>

Sales cycles for large global accounts of VMware, such as Barclays, are typically long and can run for multiple years.  (*See* Doherty Aff. ¶ 4; Klauber Dep. 163-64).  For about a year prior to Klauber's assignment to the Barclays deal, VMware had been engaged in an ongoing

effort to complete a large licensing transaction with Barclays.  (*See* Page Aff. ¶ 16; Doherty Aff. ¶¶ 5-8; Klauber Dep. 163-64).  Initial discussions and negotiations between VMware's sales leadership and Barclays began in 2017, including early meetings with the global head of IT infrastructure for Barclays in May 2017.  (Doherty Aff. ¶ 5).  In August 2017, a major presentation to Barclays occurred in London and in January 2018, a critical meeting with members of the Barclays IT leadership team took place in Austin, Texas.  (Doherty Aff. ¶ 5; Klauber Dep. 164-65).  Klauber did not participate in any of the presentations, meetings, or negotiations with Barclays in 2017 or January 2018.  (Klauber Dep. 164-65; Doherty Aff. ¶¶ 5-9).

In 2018, the VMware team working on the Barclays deal created a "war room" in London, where they worked during the three to four months prior to the close of the deal. (Doherty Aff. ¶ 6; Klauber Dep. 165).  Klauber did not work out of the war room.  (Doherty Aff. ¶ 8).  Due to the time difference between North America and London, he could only participate in some of the meetings.  (Klauber Dep. 165-66).

In May 2018, VMware assigned Klauber to be a landed representative for North America.  (Klauber Dep. 163).  In that role, he was responsible for selling products and managing relationships in VMware's North America region.  (Klauber Dep. 33, 162-63). Specifically, as to the Barclays account, he supported the core account team based in London, which was led by Noelle Doherty, the Global Account Manager for Barclays.  (Klauber Dep. 33, 163; Doherty Aff. ¶¶ 3, 5, 7, 9).  Klauber was responsible for the North American portion of the deal.  (Klauber Dep. 166).  According to Klauber, one of the things Doherty "asked [him] to do was not to disrupt the deal that was in play."  (*Id.* at 183).  Klauber acknowledges that he had limited involvement compared to Doherty.  (*Id.* at 169).

The Barclays deal fit the criteria of both a "Large Deal" and an "Exception[al] Transaction" as defined under the fiscal year 2019 terms and conditions.  (*See* 19H2 Terms & Conditions, Section 11.1; Klauber Dep. 168-69, 213; Page Aff. ¶ 17).  Following the close of the Barclays deal, the transaction and any potential commissions connected to the deal were reviewed by VMware's Sales Compensation Committee.  (Page Aff. ¶¶ 17-18).  Based on that review, VMware determined that it would adjust the commissions Klauber would receive on the transaction.  (Page Aff. ¶¶ 18-19; Doherty Aff. ¶ 10).

Klauber had several conversations with his supervisor at the time, Rocky Soper, concerning his commissions on the Barclays deal.  (Klauber Dep. 169).  During those conversations, Soper notified Klauber that his commissions in connection with the deal were under review and would be subject to adjustment based on his limited involvement.  (*Id.* at 169, 182-83, 186-88).  VMware paid Klauber $208,722 in commission compensation related to his work on the Barclays deal.  (Page Aff. ¶ 20; *see* Klauber Dep. 171, 193).  He did not further pursue the VMware dispute-resolution mechanism as to this payment.  (*Id.* at 171).

Klauber resigned from his employment with VMware in September 2019.  (Compl. ¶ 13).

### B.    Procedural Background

On October 29, 2019, Klauber filed a complaint in Suffolk County Superior Court, which defendant removed to this Court.

Count One alleges violation of the Wage Act under Mass. Gen. Laws ch. 149, § 148. Count Two alleges a claim for breach of contract.  Count Three alleges a claim for unjust enrichment.  Count Four alleges a claim for quantum meruit.

On October 5, 2021, defendant moved for summary judgment as to all counts.  In addition, on November 15, 2021, defendant filed a motion to strike certain portions of plaintiff's response to the motion for summary judgment.

II.     **Motion to Strike**

A.      **Legal Standard**

As a general matter, only evidence that would be admissible at trial may be considered by the court on summary judgment. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). Under Fed. R. Civ. P. 56(e), affidavits—although not themselves admissible at trial— may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *See id.* A motion to strike is the proper vehicle for challenging the admissibility of evidence offered at summary judgment. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994). The moving party must specify the objectionable portions of the opposing party's summary judgment materials along with the grounds for objection. *Id.* The Court should disregard only those facts that are inadmissible and consider the rest of the parties' evidence. *Id.*

B.      **Analysis**

Defendant seeks to strike various portions of plaintiff's response to the motion for summary judgment. In particular, defendant seeks to strike (1) paragraph 4 and exhibit 4 of the affidavit of David P. Angueira, (2) paragraph 6 of the affidavit of Brian Klauber, (3) paragraph 6 of plaintiff's statement of undisputed material facts, and (4) excerpts from page one and two of plaintiff's opposition to defendant's motion for summary judgment. Defendant contends that those items should be struck because they improperly refer to the parties' prior settlement of a different lawsuit that also involved commission payments, in violation of Fed. R. Evid. 408.

Fed. R. Evid. 408 prohibits the use of compromise offers and negotiations in order to prove or disprove the validity of a claim. *See* Fed. R. Evid. 408(a). "The 'critical inquiry' in considering whether a settlement agreement is admissible under this rule is the purpose for which it is being presented." *Ares-Perez v. Caribe Physicians Plaza Corp.*, 261 F. Supp. 3d 265, 271

(D.P.R. 2017) (citing *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 248 (1st Cir. 1985)).  In essence, Rule 408 "bars the introduction of an offer or agreement to compromise a disputed claim, or the content of settlement negotiations, to prove 'liability for, invalidity of, or [the] amount of' the disputed claim."  *National Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Acad.*, 548 F.3d 8, 20 (1st Cir. 2008).

However, Rule 408 is not a complete prohibition on the admissibility of settlement offers. *See* Fed. R. Evid. 408(b).  Specifically, courts may admit compromise evidence when it is offered to prove something other than liability for, or invalidity of, a claim or its amount.  23 CHARLES A. WRIGHT AND KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5310 (1980).  "For example, compromise evidence can be admitted to prove the bias or prejudice of a witness, to negate a contention of undue delay, to prove agency, ownership, or control, or to support a claim alleging that an illegal act occurred during the course of settlement negotiations." *United States v. J.R. LaPointe & Sons, Inc.*, 950 F. Supp. 21, 23 (D. Me. 1996).  This list is illustrative, not exhaustive.  *Id.*

### 1.        Paragraph 4 and Exhibit 4 of the Affidavit of David P. Angueira

Brian Klauber was one of four plaintiffs who filed an action against VMware, Inc., in 2014 in this court under the Massachusetts Wage Act that challenged the then-existing commission plan of the company.  (*See* Klauber Aff. ¶¶ 4-5 (referring to *Sanderson, et. al v. VMware, Inc.*, United States District Court, District of Massachusetts, Docket no. 1:14-cv-12123-DPW)).  That matter was settled and dismissed in late December 2015.

Paragraph 4 of the affidavit of David P. Angueira attests that a copy of the confidential settlement agreement in the *Sanderson* matter is attached as exhibit 4.  Exhibit 4 is a redacted version of the agreement.

Plaintiff contends that when he signed off on the terms and conditions of the VMware

commission plan at issue here, he did so with the understanding that they were not enforceable under Massachusetts law.  (*See, e.g.,* Klauber Aff. ¶ 12; SOF ¶ 28 (stating that plaintiff signed off on the terms and conditions "with the understanding that . . such conduct by VMware, Inc., was unenforceable.").  He uses evidence of the settlement agreement to show his state of mind when signing off on VMware's terms, and not to prove or disprove the validity of his current claims.  Whatever the relevance of his then-existing mental state, such a use of the agreement does not violate Fed. R. Evid. 408.  Paragraph 4 and exhibit 4 of the Angueira affidavit therefore will not be struck on that basis.

Defendant further contends, however, that the settlement agreement should be struck because paragraph four of the settlement agreement "explicitly states that by signing the agreement, [Klauber] warrants that he will not disclose anything regarding the agreement, including but not limited to its existence, to anyone."  (*See* Dkt. No. 83, at 4).  Plaintiff contends that defendant expressly waived the confidentiality of the settlement agreement by (1) repeatedly questioning plaintiff about the prior litigation during his deposition and (2) claiming that plaintiff agreed and accepted the terms and conditions of his employment, and by putting that at issue, plaintiff should be able to rebut that contention by showing his subjective state of mind when signing the agreement.  (*See* Dkt. No. 88, at 4-7).

Waiver of a contractual provision can be "express" or "can be inferred from a party's conduct and the surrounding circumstances."  *Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc.*, 444 Mass. 768, 774 (2005) (quoting *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., B.L.*, 767 F. Supp. 363, 372 (D. Mass. 1991)).  "There is [] also the objective consideration that when [a party's] conduct touches a certain point of disclosure, [whether] fairness requires that [the confidentiality] privilege shall cease [regardless of] whether [the party]

13

intended that result or not.  [A party] cannot be allowed, after disclosing as much as [it] pleases, to withhold the remainder." *American Optical Corp. v. Medtronic, Inc.*, 56 F.R.D. 426, 431 (D. Mass. 1972) (citing 8 WIGMORE ON EVIDENCE § 2327 (McNaughton Rev., 1961)).

Here, during plaintiff's deposition, defendant did not object to plaintiff discussing the prior litigation and indeed asked several follow-up questions concerning the earlier lawsuit.

> **Plaintiff:**  To answer that question, I'd need permission from my attorney to reference a prior experience.
>
> **Plaintiff's Counsel:**  I have no objection to your referencing the prior litigation in the context of this deposition regarding the lawsuit you had – you and your colleagues – against VMware where this very same issue arose if you need to refer to that to answer this question, as long as defense counsel has no objection, either.
>
> **Defense Counsel:**  I don't have any objection.

(Klauber Dep. 128); *see also* Klauber Dep. 129 (defense counsel asking, "you were aware through your 2013 experience that the company had an exception[al] transaction provision in its terms and conditions, right?"); Klauber Dep. 130 ("your dispute with the company in 2013 had to do with the same exception[al] transaction clause, right?").

It can be inferred from defendant's conduct during the deposition of plaintiff that discussions of the settlement agreement were permitted.  Moreover, in terms of fairness, it cannot be the case that defendant can discuss and ask about the settlement agreement as it sees fit and then raise the issue of confidentiality at other times during this litigation.

Accordingly, despite the limitations created by Rule 408 and the confidentiality agreement found within the parties' 2013 settlement agreement, paragraph 4 and exhibit 4 of the Angueira affidavit will not be struck.[3]

---

[3] Defendant does not contend that the present claims are barred by the settlement agreement or principles of claim preclusion.  *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 384 (2d Cir. 2003) ("Where the facts that have accumulated after the first action are enough on their own to sustain the second action, the new facts clearly

### 2.      Paragraph 6 of the Affidavit of Brian Klauber

Paragraph 6 of plaintiff's affidavit reads as follows:

> After extensive discovery in that matter, the case was resolved as a result of our claims that VMware, Inc.'s employment contracts with us were not enforceable due to the unilateral and arbitrary provisions allowing VMware, Inc. to change our commissions after the fact.

(Klauber Aff. ¶ 6).  Unlike the statements described in the prior section, plaintiff is not attempting to use paragraph 6 to demonstrate his state of mind when signing off on VMware's plans, as he contends.  Rather, paragraph 6 is offered to demonstrate that VMware settled the prior litigation because the terms and conditions related to the payment of commissions were unenforceable under Massachusetts law.  And the claim at issue here is the same claim that was at issue in that litigation.  Plaintiff is thus attempting to use evidence of the prior settlement to prove the validity of his claim here, which is improper under Rule 408.

Accordingly, the Court will strike paragraph 6 of plaintiff's affidavit.

### 3.      Paragraph 6 of Plaintiff's Statement of Undisputed Material Facts

Paragraph 6 of plaintiff's statement of undisputed material facts reads as follows:

> After extensive discovery in the matter of *Sanderson, et. al v. VMware, Inc.*, United States District Court, District of Massachusetts, Docket No. 1:14-cv-12123-DPW, the matter was resolved as a result of Plaintiff's arguments that VMware, Inc.'s conduct of improperly reducing its employees' commission payments was not enforceable under Massachusetts law.

(Pl. Statement of Undisputed Facts ("SUF") ¶ 6).  Again, Klauber is impermissibly offering the prior settlement agreement to prove the validity of his claims in this matter.

---

constitute a new 'claim,' and the second action is not barred by res judicata.") (citing *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)); *see also Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir.2005) (finding that subsequent conduct, "even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action").

Accordingly, the Court will strike paragraph 6 of plaintiff's statement of undisputed material facts.

### 4.   Excerpts from Plaintiff's Opposition to Defendant's Motion for Summary Judgment

The last two paragraphs on page two of plaintiff's opposition to defendant's motion for summary judgment also improperly refer to the prior settlement agreement in violation of Fed. R. of Evid. 408.  Plaintiff restates paragraph 6 of his statement of undisputed material facts, and also states the following:

> Multiple provisions in each of these contracts are illegal under Massachusetts law; a fact that VMware, Inc. became well aware of over the course of their previous litigation with Mr. Klauber.

(Pl. Opposition at 2).  Klauber is again referring to the settlement agreement to establish that the current claim at issue has already been decided—that is, that VMware's contracts are unenforceable under Massachusetts law.  Again, this is improper under Fed. R. Evid. 408.

Accordingly, portions of page two of plaintiff's opposition (specifically, the first and second full paragraphs on page two) to defendant's motion for summary judgment that improperly refer to the settlement agreement will be struck.

## III.   Motion for Summary Judgment

### A.   Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would

permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57. Affidavits submitted in opposition to a motion for summary judgment will be considered as evidence unless the movant separately moves (and the court grants) a motion to strike their contents in whole or in part. *See* 10B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (3d ed. 2010).

### B.   Analysis

#### 1.   Wage Act Claim

To state a claim under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, a plaintiff must allege that (1) he was an employee under the statute, (2) his form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying his wages in a timely manner. *Stanton v. Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 10 (D. Mass. 2009). Defendant does not contest that plaintiff was an "employee" within the meaning of

the statute.  Rather, defendant contends that plaintiff's commissions should not be considered "wages" as covered by the statute.

Commissions qualify as wages under the statute "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee . . . ."  Mass. Gen. Laws ch. 149, § 148; *see Weems v. Citigroup, Inc.*, 453 Mass. 147, 151 (2009).  Commissions are "due and payable" only if any contingencies relating to their entitlement have occurred.  *Fine v. Guardian Life Ins. Co. of Am.*, 2022 WL 673663, at *8 (D. Mass. Mar. 7, 2022); *Lohnes v. Darwin Partners, Inc.*, 2002 WL 31187688, at *3 (Mass. Super. Ct. July 23, 2002).  "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan . . . ."  *McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 289 (D. Mass. 2013) (citations omitted).

Here, the terms of plaintiff's compensation plan provide that commissions are only earned if the following contingencies are met:  (1) the plan participant accepted his or her compensation plan, (2) the participant had eligible quota achievement, and (3) a plan reconciliation for Exceptional Transactions and/or Large Deals (among other circumstances) has been completed by VMware, with any potential adjustments to commissions made.  (Núñez Aff. ¶ 9; Page Aff. ¶ 9; 18H2 Terms & Conditions, Section 5.1; 19H2 Terms & Conditions, Section 6.1).  Defendant contends that plaintiff's commissions do not qualify as "wages" under the statute because his commissions were not "due and payable" until after a plan reconciliation had occurred.  (Def. Mem. at 11).  In other words, it contends that the employee is not entitled to a commission until after that contingency was met.  Plaintiff contends that the terms of the compensation plan, which permit an employer sole discretion to alter commissions before a

18

commission is "earned," would circumvent the protections of the Massachusetts Wage Act and is therefore unenforceable under Massachusetts law.  (Pl. Opp. at 11-12).

In *Daly v. T-Mobile USA, Inc.*, T-Mobile's employment manuals specifically provided that T-Mobile could alter the method of calculating commissions in its sole discretion.  93 Mass. App. Ct. 1123, 2018 WL 3999439, at *1 (2018).  Specifically, for "windfall" sales, "the manuals allow[ed] T-Mobile to alter or cap commissions or even to exclude such sales altogether from the calculation of commissions."  *Id.*  The Massachusetts Appeals Court granted summary judgment in favor of T-Mobile as to plaintiff's Wage Act claim and held that "nothing in the Wage Act prevent[s] [an employer] from exercising its discretion to alter the commission formula prior to [a commission being earned]."  *Id.* at *5.[4]

Similarly, in *Vonachen v. Computer Associates Int'l, Inc.*, the district court found that the employer had "broad discretion to adjust commission payments" and that such "general discretionary provisions of the Compensation Plan suffice[d] for [the employer] to prevail as a matter of law, permitting [the employer] to act within its discretion in adjusting compensation." 524 F. Supp. 2d 129, 134-36 (D. Mass. 2007).

The circumstances in *Vonachen* are similar to those at issue here.  The employer in *Vonachen*, like VMware, retained discretion to adjust commission compensation in certain cases involving large transactions.  *Id.* at 135.  Moreover, unlike VMware, the employer in *Vonachen* retained "wide-ranging discretion with respect to compensation *in general*."  (*Id.* at 134) (emphasis added).  And the court took no issue with such broad discretion remaining in the hands of the employer.

---

[4] In *Daly*, commissions were earned when a new account was activated.  *Daly*, 2018 WL 3999439, at *5. Therefore, the Appeals Court found that after a new account is signed, commissions could be adjusted up until that account was activated.  *Id.*

The terms and conditions at issue here regarding commission compensation are, therefore, not unenforceable under the Wage Act.[5]  That brings the inquiry back to the question of whether plaintiff's commissions qualify as wages under the statute.

Here, the plan is clear—an employee has not "earned" commission compensation until a plan reconciliation for Exceptional Transactions and/or Large Deals has been completed by VMware.  (*See* 18H2 Terms & Conditions, Section 5.1; 19H2 Terms & Conditions, Section 6.1).  Both the DXC deal and the Barclays deal fell within VMware's "Exceptional Transactions." (Page Aff. ¶¶ 11-15, 17; Klauber Dep. 111-14, 168-69, 213).  Therefore, plaintiff's commission compensation for those deals did not become "due and payable" until *after* a plan reconciliation had occurred—until after all contingencies were met.  Any *potential* commissions on those deals, prior to the occurrence of a plan reconciliation, would thus not qualify as wages under the statute.

Because (1) the commission payments plaintiff contends he is owed are not "wages" within the meaning of the Wage Act and (2) VMware's terms and conditions are enforceable under Massachusetts law, the claim under the Wage Act cannot survive.  For that reason, defendant's motion for summary judgment as to plaintiff's Wage Act claim will be granted.

## 2.    Breach of Contract Claim

Defendant further contends that the breach of contract claim fails for the same reasons as the Wage Act claim—specifically, that there was no breach because the terms and conditions allowed VMware to adjust plaintiff's commissions for Exceptional Transactions and Large Deals.  And VMware simply exercised that discretion to adjust plaintiff's potential commissions

---

[5] For the same reasons, this Court does not find that VMware's compensation plans or terms and conditions constitute unenforceable special contracts under the Wage Act, as plaintiff contends.

on those deals.[6]

The Court agrees.  Because the terms and conditions expressly address commissions for Exceptional Transactions, VMware could (as it did here regarding the DXC and Barclays deals) modify the commissions earned on such deals.  Doing so does not constitute a breach.  *See Daly*, 2018 WL 3999439, at *4 (holding that the employer could modify the commissions consistent with the terms of the employment manuals and doing so is not a breach).  Accordingly, summary judgment will be granted on the breach of contract claim.

As a final note, nothing in this opinion should be read to suggest that employers generally have the power to restructure their business affairs in order to deprive salespeople of commissions.  Among other things, such an action might violate the implied covenant of good faith and fair dealing.  *See*, *e.g.*, *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122 (D. Mass. 2005).   Here, however, the adjustment of the commissions was expressly contemplated by the contract.  Furthermore, and in any event, the complaint does not assert a claim for breach of the implied covenant of good faith and fair dealing.

### 3.      Quantum Meruit and Unjust Enrichment Claims

Defendant contends that plaintiff's quantum meruit and unjust enrichment claims fail because plaintiff cannot avoid the terms of an express agreement to which he assented.  (Def. Mem. 18-19).

---

[6] It is undisputed that Klauber signed off on the terms and conditions provided by VMware.  (Klauber Dep. 38-39; 45-46).  Whether he believed such terms were in fact enforceable, that is, his subjective intent regarding the signing of the terms and conditions, does not change the fact that he knowingly and voluntarily signed the contract and is therefore bound by it.  *See Greene v. Ablon*, 794 F.3d 133, 147 (1st Cir. 2015) ("[T]he formation of a valid contract under Massachusetts law requires objective, not subjective, intent."); *CSX Transp. Inc. v. ABC & D Recycling, Inc.*, 2013 WL 3070770, at *5 (D. Mass. June 14, 2013) ("A party's intent is deemed to be what a reasonable man in the position of the other party would conclude his objective manifestations to mean.").  *Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 781 (2007) (finding that assent may be inferred from a party's conduct).

"A plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties." *Boston Med. Ctr. Corp. v. Secretary of Exec. Office of Health & Human Servs.*, 463 Mass. 447, 467 (2012); *see also* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").  It is undisputed that plaintiff e-signed and accepted the terms and conditions of each of his compensation plans with VMware.  (*See* SOF ¶¶ 12, 14).  Therefore, VMware's commission plans are valid and binding contracts that govern this dispute.  Accordingly, VMware is entitled to summary judgment on plaintiff's quantum meruit and unjust enrichment claims.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendant's motion to strike is GRANTED in part and DENIED in part and defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated: April 20, 2022                 Chief Judge, United States District Court